MORRILL REALTY CORPORATION, Plaintiff, *v.* RAYON HOLDING CORPORATION, Defendant.

Supreme Court, New York County, February 13, 1930.

*Morris Hillquit*, for the plaintiff.

*Joshua Bernstein* [*Moses H. Grossman, Louis J. Vorhaus, George L. Allin, Philip S. Dean* and *David Vorhaus* of counsel], for the defendant.

*Arthur J. Hilly, Corporation Counsel* [*William T. Kennedy* of counsel], *amicus curiæ*.

SHERMAN, J. The question presented is whether plaintiff was justified in rejecting at a closing the title to premises comprising the block fronting on the westerly side of Madison avenue between Thirty-sixth and Thirty-seventh streets in the borough of Manhattan, known as Nos. 218–230 Madison avenue and 16–18 East Thirty-seventh street. The contract of sale expressly states that the plaintiff was acquiring the premises for the purpose of constructing a business building.

The premises now consist of dwelling houses erected for residential purposes. The contract enumerates certain agreements and covenants subject to which title is to be conveyed. The well-known Murray Hill restrictive covenant of February 22, 1847, is not among them. It does mention, however, a so-called Paine covenant, which the seller expressly agreed had been merged and extinguished when the premises came into its conceded common ownership. Finally the seller covenanted that the entire parcel was legally included within the retail zone district as established by the board of estimate and apportionment of the city of New York on April 18, 1929, and might be used thereunder for business purposes.

Plaintiff places its rejection upon the grounds: *First*, that the premises are subject to the Murray Hill covenant; *second*, that the Paine covenant is in effect and prevents the erection of a large business structure, and finally that the premises are not legally embraced within the retail district zone. It demands the return of the earnest money and the search expense. Defendant by its counterclaim asks judgment of specific performance.

In a suit brought by the owner of lots on the southwest corner of Madison avenue and Thirty-eighth street the language of the Murray Hill covenant dated February 22, 1847, was construed (*Schoonmaker* v. *Heckscher,* 171 App. Div. 148, 149), and it was held that lots on the west side of Madison avenue were not subject to that covenant. This decision was affirmed in the Court of Appeals (*Schoonmaker* v. *Heckscher,* 218 N. Y. 722). In that case the complaint as orally amended was dismissed at trial upon counsel's opening.

Plaintiff here asserts that this decision held merely that Hecksher's property was not subject to the agreement; that the language of the opinions was *obiter* and that the decision is not to be viewed as determining the status of the property here in suit; that the covenant must be re-examined and any ambiguity now resolved in the light of evidence here produced (but not before the court in *Schoonmaker* v. *Heckscher*) of numerous deeds in the chain of title which charge this property with the restrictions of that covenant, as well as other evidence said to show the intent of defendant's then predecessor in title to include these premises within the scope of that agreement. It is further contended that defendant Hecksher's answer showed that his predecessor in title at the date of the Murray Hill covenant was (unlike defendant's predecessor in title here) a stranger to the agreement and that in Hecksher's chain of title there was no reference to the agreement. The court in that action was not concerned with the allegations of Hecksher's answer, for the complaint was dismissed by reason of its own averments — not those of the answer.

The text of the Murray Hill restrictive covenant was before the court, and the holding was broadly to the effect that it did not cover lands on the westerly side of Madison avenue. That judgment could not have been reached if the court had been willing to construe the covenant, as now demanded by plaintiff here. An examination of the evidence in this case, if it had been before the court n that case, must have led to the same result.

There is no question but that lands abutting on the westerly side of Madison avenue must now be regarded as not within the restricted area. The statement in subsequent deeds in the chain of title that the property here in suit was conveyed subject to this restriction does not place the land under the yoke of the restriction where the covenant itself by its terms did not do so. (*Korn* v. *Campbell,* 119 App. Div. 401; affd., 192 N. Y. 490; *Title Guarantee & Trust Co.* v. *Fallon,* 101 App. Div. 187; *Matter of Oakes,* 248 N. Y. 280, 284.) The so-called Paine covenant of January 17, 1853, was between John R. Murray and John Paine. By it the

grantor and grantee owning several lots on the west side of Madison avenue between Thirty-sixth and Thirty-seventh streets agreed that they would erect upon such lots within forty feet of the Madison avenue line only dwelling houses twenty-five feet in width. The covenant was to run with the land, and a like covenant was to be inserted in future deeds of conveyance. Plaintiff does not dispute that these lots have been gathered into one ownership, nor that thereby the restriction would be extinguished, but it asserts that because Murray owned other parcels in the immediate neighborhood at the time when the covenant was made he must be held to have intended to benefit those parcels by these restrictions, and that under those circumstances the present owners of such neighboring parcels have what is called a " negative easement " in the Madison avenue front, which would enable them to enforce the Paine covenant.

There is no merit in this contention. The agreement by its terms was operative solely between adjoining owners and the fact that one of the contracting parties owned lots on Park avenue and may have been interested in maintaining the entire Murray Hill area as a residential district cannot extend the operation of the instrument which designates the precise property to be affected by its terms. It was a covenant applying only to the parcels therein mentioned for their reciprocal benefit. Restrictive covenants may not be enlarged by construction. The rule of interpretation is distinctly to the contrary. The natural right to the full, free and untrammeled use of property is favored. (*Schoonmaker* v. *Hecksher, supra.*)

The remaining question is whether or not these lands are legally within the retail district as established by the board of estimate and apportionment on April 18, 1929. The court has had the benefit of briefs filed by the corporation counsel and by attorneys for various associations of property owners (which had supported the establishment of the retail district), whose attorneys have been accorded the privilege of submitting their views as *amici curiæ*. It is unnecessary to refer in detail to all of the proposals before the board of estimate since the inception in 1916 of the general zoning movement.

There can be no doubt that the municipal authorities may adopt as a proper exercise of police power, resolutions which limit the use of lands. (*Lincoln Trust Co.* v. *Williams Building Corp.*, 229 N. Y. 313.) On July 25, 1916, the board of estimate and apportionment of the city of New York, sitting as a committee of the whole, adopted the Building Zone Resolution. Under that resolution there was established, among other things, a map showing allowable uses.

This use map indicated three kinds of districts, *i. e.*, residence, business and unrestricted districts.

The property involved in this suit was located within the boundaries of the residence district. The zoning resolution also made provision for amendments and changes in the district lines (§ 24). After prescribing the procedure to be followed and the requirements to be fulfilled in order to initiate an amendment, section 24 of the Amended Building Zone Resolution provided: " If, however, a protest against such amendment, supplement or change be presented, duly signed and acknowledged by the owners of 20 per cent. or more of any frontage proposed to be altered, or by the owners of 20 per cent. of the frontage immediately in the rear thereof, or by the owners of 20 per cent. of the frontage directly opposite the frontage proposed to be altered, such amendment shall not be passed except by the unanimous vote of the Board."

For about eight years these districts, as adopted, appear to have satisfied the requirements of the city. Changes, however, were constantly occurring in the uses of property due to grouping of trades, erection of new structures and the general development of industry and business. The high-grade shopping and hotel district in which were found the more important stores and hotels was encroached upon by other trades which were believed to interfere with the proper conduct of such businesses and the patronage of their customers and guests. In particular, the proximity of manufacturing plants, the delays due to the resultant trucking and sidewalk uses and traffic conditions, worked adversely. The shopping centers moved from time to time and it was sought to locate them permanently, free from such hindrances in a new and restricted retail district. In the month of March, 1924, there was filed with the board of estimate and apportionment the first of a series of letters and communications from civic bodies requesting an amendment to the zoning resolution which would make provision for the creation of an entirely new use district to be known as the " retail district." Thereafter, from time to time proposed maps were filed indicating what area and properties various organizations and individuals urged should be included within the proposed new district. On April 18, 1929, the board of estimate and apportionment adopted by a unanimous vote a resolution amending the zoning resolution and provided for the creation of the new " retail district." At the same meeting of the board a resolution was also adopted which fixed the boundaries of the new district in accordance with those indicated on Map H, which map was the last of eight proposed maps submitted and which included all properties

found in all other proposed maps. This resolution was passed by a vote of eleven to five, the president of the board of aldermen and the president of the borough of Manhattan voting in the negative. The property owned by the defendant herein was included in the district thus created. Both of these resolutions must be read together. Together they originated a new use district. It is now contended that the resolution which fixed the boundaries of the " retail district " is without legal force or effect in so far as the property in suit is concerned, by reason of the fact that the owners of twenty per cent of the frontage directly opposite this parcel protested against its inclusion in the retail district, and the resolution did not receive the unanimous affirmative vote of the board. If the situation were that this property had, upon petition, been transferred from one existing use district to another, this contention might not be without force. Such, however, is not the case. This was no mere alteration, supplement or change within the scope of section 24. The board of estimate and apportionment had for upwards of five years been concerned with the creation of an entirely new district in order adequately to meet changing conditions in the midtown section of Manhattan. During all that time the board was not heeding merely the individual preference of a particular block owner, but rather the wider purpose of devising and erecting for the general good a new district which, as an entirety, would answer the need which it was felt existed for setting apart in the midtown section an entirely new use district. A reading of section 242-b of the Greater New York Charter (as amd. by Laws of 1924, chap. 295) and section 24 of the Amended Building Zone Resolution makes it impossible to believe that it was intended that twenty per cent of the ownership of a small fraction of the use district so being created should be able to thwart the adoption of the district as an entirety by securing the obstructing voice of a single dissenting vote in the board. Effective opposition could be made only by the owners of twenty per cent of the entire frontage — the perimeter of the area of the new district.

The opposition manifested was clearly inadequate to require a unanimous vote in support of the resolution. The complaint is dismissed upon the merits and judgment for defendant granted as prayed for in the counterclaim. Submit findings.